Montour v. Eplett is our next case. Ms. Edinger. Welcome back, Ms. Edinger. Thank you, Your Honor. May it please the Court, Jessica Edinger for Tyler Montour. Defense counsel assumed that four key witnesses wouldn't show up to testify that Montour was the shooter. Of those four, three were eyewitnesses. Of those four, three had talked to the police already and their statements were in the complaint. Of those four, three are on probation and one is a confidential informant. Defense counsel knew all of this. Still, she assumed all four witnesses wouldn't show up. And even after all four had testified, clearly putting the gun in Montour's hand, counsel clung to the theory that Montour wasn't the shooter. So can I ask you this? There are a couple of points along the way that you might be focusing on in particular for ineffective performance. One of them is the moment when she advises against taking the plea deal that's proffered. You also are focusing on, well, after she hears all this evidence and makes her own opening statement, which is deferred before she starts putting her case on. But I want to pause there for a minute because it's very hard for me to imagine what she could have done by that time. You know, she can present whatever she manages to put together that would exonerate him from knowing about the attempted first-degree intentional homicide charge. And she knows that having him get up there and say, you know, I was aiming for their kneecaps or whatever, their legs, the ground, doesn't really help much. I think by the time you get to the middle of the trial, it's going to go the way it goes. So, you know, it seems to me the only real inflection point is when she says, don't take the plea. And that's before she finds out that all of the witnesses are, in fact, going to come. They're all going to testify the way they do. The inflection point, Your Honor, could come later. Certainly, Ms. Frost should not have made the assumption she did at the beginning. There were numerous red flags to put her on notice that it was an absolutely unreasonable assumption. But Your Honor's focused on opening statement, which is reserved. Which is reserved. And by the time all of the government's evidence is in, I've been trying to, like, play a movie in my head of, you know, what would her trial strategy have been? She needs to defend him, of course, against the more serious charge that's being proffered. You know, she really can't get up there and say, well, you know, yes, of course, he recklessly endangered somebody's safety, but that's all he did. You don't expect her to have said that, I assume. The only viable defense is to dispute mens rea at that point. Because Ms. Frost has nothing to impeach the testimony or to contravene the fact that two eyewitnesses have testified that they saw Mr. Montour holding the gun. So the only thing to do, and that she could absolutely have done with that opening statement and then her subsequent cross-examinations before, but also her case, and then especially in closing argument, is to dispute mens rea. And I want to emphasize... Is the what? I'm sorry. I couldn't hear that. Is to dispute mens rea. That Mr. Montour doesn't have the mens rea to have committed the greater offense. All three prosecution experts' testimony could have been marshaled in support of that argument, the one she didn't make. So you've got Officer Mayer saying that somebody with intent to kill aims at center mass, and you've got physical evidence that the bullets are aimed at the ground. And we know that because we have Mr. Simonson, the firearms analyst, saying that bullets go in a straight line from where they get fired. The bullet damage to the bar's back door is three and a half inches off the ground. There's a ricochet bullet that hits Mr. Kurzenga in the leg about a couple inches above his sock line. So the physical evidence, setting aside credibility of witnesses, is that the bullets are aimed at the ground. And then you've got the state's third expert, the pathologist, Dr. Bzdricki, and she says, well, extremity wounds are potentially lethal. Potentially. But the problem is that the standard for the mens rea for the greater offense is that the conduct has to have been practically certain to cause death, and that the defendant's acts have to unequivocally demonstrate that. That is very different than the mens rea for the lesser included offense, which is the one she should have been leading the jury towards, given the state of play. And that is that the defendant was aware that his conduct created an unreasonable and substantial risk of death or great bodily harm. But she doesn't want to say that to the jury. She doesn't want to stand up there and admit what you just said, surely. She wants the best outcome for her clients. And when the choices are, I have substantial evidence from witnesses that I unreasonably assumed wouldn't show up to say that you're the shooter, and they've testified, and I've got nothing to contravene that, I have to pivot. And you don't have to just take my word for it, right? Let's look at the prevailing professional law. No, I can easily see how she could emphasize the close to the ground stuff and make the argument that he certainly wasn't trying to kill anybody. He wasn't trying to commit very serious bodily harm, et cetera. What I'm having trouble is how she then somehow, but she does that. I mean, she cross-examines people. She tries to punch holes in their stories. She can't contravene. She can't impeach on the key facts of the case. She cross-examines. Didn't she, during cross-examination, try to raise a question about whether the eyewitnesses were pointing the finger at the right man? No. Don't think so? No, I don't think so. I'll agree with you that it's difficult to tease it out of the cross-examination, but isn't that what she was trying to do? I think she impeaches them on ancillary facts that don't go to that key question, because she says, oh, well, you know, the car, maybe it's blue, maybe it's white, I'm a little bit unsure. Maybe there's somebody in the back seat of the car, but the testimony is that the shooter is in the passenger seat. The testimony is that two eyewitnesses see that it is Tyler Montour holding the gun, that there's nothing that she can do to contravene that. In fact, she had an option to consider had she fully investigated the case. Maybe there was somebody else who was the shooter, but the record's very clear. She didn't have any evidence, so she couldn't file the kind of motion that Wisconsin requires her to file if she's going to point to somebody else as the shooter. So her testimony is more like what we see in Thomas v. Clements, where it's meandering and it's not enough to make up for the harm that's been caused. Why doesn't your analysis push us to the point where even if her performance was deficient, there's just no way that a state court would, had to find that it was prejudicial? On prejudice, we're, I'm sorry, I want to make sure I understand the question. So on prejudice, we're under De Novo 2240. I know, and I'm looking at this record and seeing all these eyewitness testimony, you And even on so-called De Novo review, our assessment is still quite deferential to what the state court did. It always has been. It was before AEDPA even existed. And on these facts, you would have to say that the state court made some cognizable error or just say our own assessment of the prejudice part shows that these mistakes really didn't make a difference. It absolutely made all the difference, Your Honor. And the difference is we have the Supreme Court telling us that closing argument matters. Not just that it matters, it is no aspect of advocacy is more important. That's what Haring v. New York makes very clear. And here, the only reference to the lesser included offense is the state telling the jury to ignore it. Ms. Frost says nothing. But the jury is instructed on it, right? Sure, the jury receives the instruction. Well, that's a big deal, actually. I don't think it matters. And I know that because in Falconer, this court made clear that we presume juries don't understand the distinction between greater and lesser offenses. But we also presume juries follow the instructions that they're given. They try. But if all they're given— No, but we make that. We say that all the time. Of course, Your Honor. I don't mean to press on that point. The point is that the government is—the jury, excuse me—is receiving argument from the state about how the evidence lines up with the elements, and they get nothing, nothing, not even close from Ms. Frost. And that's what makes all the difference. The jury tries its best. But when the difference is argument versus silence, it's a weighted scale. And so, if I may continue, that is what makes the difference in this case. Counsel let a real opportunity for defense slip away. She had to explain the differences. And the possibility that there's a chance of conviction, this court has been very clear, doesn't remove reasonable probability. Montour is serving a sentence that is nearly three times longer than the statutory maximum. It makes all the difference. So I'll reserve the remainder of my 30 seconds, unless the court has further questions right now. Certainly, counsel. Mr. Held. Good morning, Your Honor. Assistant Attorney General Elliot Held for the respondent, Kathy Jess. May it please the court. Mr. Montour defaulted his ineffective assistance claim by failing to fairly present it to the Wisconsin Supreme Court. His appellate attorney filed an Anders-type no-merit petition disclaiming any non-frivolous basis for review, and Montour failed to file a supplement even requesting review, much less presenting issues, criteria, and reasons for review. The Wisconsin Supreme Court has told us in no uncertain terms that doing so is fundamental to presenting a claim to that court, and this court has held that failure to do so results in default. On the merits, Montour disclaims any argument that he can overcome HEDPA deference on the law in the reply brief and puts all his eggs into the unreasonable factual finance basket. From page two of the reply brief, quote, Montour is not arguing that the Wisconsin Court of Appeals decision is contrary to federal law, unquote. Well, that concedes the whole action, because under 2241 and 2254, this court only has the Wisconsin Court of Appeals decision is contrary to federal law, whether under HEDPA or not. But even if Montour simply made a misstatement in the reply brief and doesn't tend to argue that the state court misapplied federal law, he cannot overcome double deference under HEDPA. The state courts made no unreasonable factual findings, and the Wisconsin Court of Appeals reasonably determined that trial counsel was not ineffective for maintaining the acquittal strategy that she and Montour agreed on. The record all the way down supports that that's what happened. It was reasonable for trial counsel to think that changing strategy midstream would have destroyed their credibility with the jury and eliminated the chance of acquittal with no realistic chance of conviction. How does that justify the failure to emphasize the recklessly endangering possibility in closing argument? That's the third point that we haven't talked about. We have the point where the plea agreement is rejected. We have the point when it's his turn in the middle of the trial, and then we have the closing argument. It seems to me there would have been every possibility to make a closing argument that addresses the mens rea element and that says, at worst, this was reckless or accidental or words like that, but nothing close to the intent that's required for attempted first degree intentional homicide, one of the worst crimes in the books. It's probably their least bad argument, I would say, Your Honor. You've hit it. When they say argument matters, that from the hearing case, that's of course not a strickling case. That was a case where I think argument was totally denied. But argument does matter. We would all agree with that. Sure. She made argument. In her argument, she continued with the strategy that she had all along. I could list a whole bunch of sites. No, don't. I won't. But she did. I mean, if you look at the record, it's 34-11 of the district court docket. She emphasized all the things about impeaching. These different witnesses, Gonzales, excuse me, the victim and Adrian Valadez, different colors of the car, lying about whether or not Gonzales still had a gun, pointing to Gonzales. Is he Tyler Gonzales now or is he Tyler Montoya? He goes by Tyler Gonzales, but it hasn't been changed in any of the documents. So did he actually legally change his name? I do not know, Your Honor. I understand. It's my understanding that he goes as Gonzales. I think the answer to that is yes. But he did legally change it. It might be. It might be. So we should change the caption of the case. Yes. We have to caption cases in the names of the real people. By the way, who is the right respondent? I believe it's Kathy Jess, Your Honor. If Mr. Montoya is... So why do our briefs give some different name? I believe... It looks like this is a case where both parties are misnamed. At least we know who they are. It's possible, Your Honor. I thought it was Kathy Jess. I thought he was at Oshkosh. But I could be mistaken and I apologize if I'm wrong. But your brief names the warden as Cheryl Epplett. It might be. It might have been Epplett and he might have moved to Jess. But maybe opposing counsel can figure that out, Your Honor. Well, it is important to have the right people involved in the case. But, I mean, of course, I would represent the respondent no matter who it is as long as it's a Wisconsin State Prison Warden. But you're correct. It should be corrected if it's wrong. But as far as prejudice from the argument, Judge Wood, the danger, of course, is if she gets up there and she makes inconsistent defense as well, even if you believe that he's the one who pulled the trigger, he was aiming low or there's no good evidence that he was aiming at their chest, well, then the danger there, as the cases, various cases say, is that the jury is going to hear this inconsistent defense and be alienated and think, no, he did it. You're just grasping at straws now. There's another issue here is that he chose not to testify after a legitimate colloquy, a valid colloquy with the trial judge that's on the record, and he made the voluntary knowing intelligent decision not to testify and provide the best possible evidence of what his mens rea was. But he's not arguing that there was any error in that respect. Well, they are arguing that. They're arguing that there was error, that she gave bad advice, that he shouldn't testify. But our argument is it doesn't matter if her advice was bad or not because he made the voluntary intelligent decision not to testify. And once he did that, it goes to your question, Judge Wood, what's she supposed to argue then at closing? Because she doesn't have his testimony about his mens rea. So he can't blame her for that. She would just have to point, as you said, to, well, the bullet marks were low. So she would say the government hasn't proven that he had the intent to fire. I mean, this is a doable thing. And the government is going to come back on rebuttal, and they're going to say the victim testified that he was looking down the barrel. And I don't know if anyone here has ever looked down the barrel of a loaded weapon and pointed at him. I have, unfortunately. It is a psychologically, qualitatively different experience from having a gun pointed in your general direction than having it looking down the barrel. And they're going to say this on rebuttal, and they're going to say he fired from 15 feet away or 10 yards away or whatever it was and fired X number of shots. And as they argued, you don't do that unless you intend to kill someone. So I don't think an argument that, well, the bullet marks were low. Fifteen feet and 10 yards are quite a difference. And I don't remember exactly what it was. But I want to say he said it was 15 feet or something like that. But it was close. It was a small parking lot. One of the things that I think we judges are shocked by is the number of police who fire at suspects from 15 feet away and miss. Surely you're not going to argue that anybody who sees a gun from 15 feet away necessarily knows they're in imminent danger of life. They would certainly fear that they're in imminent danger of life if you've got a gun. They might believe that falsely if they don't know the data about how inaccurate people are with handguns. They could have a reasonable but incorrect belief. That's fair enough, Your Honor. But, again, the point that the bullets were low, that could just as easily reflect a bad shot or the fact that he's firing from a moving car. So I don't think just pointing that out would have made the difference. The only person who always hits by shooting from a handgun is James Bond. Maybe, Your Honor. No one ever hits Bond, by the way. That's true. But I just don't think that making the judgment, again, to your question, I just don't think that they can show prejudice that not arguing, well, the shots were low to the ground, shows a reasonable probability of a different result. I just don't think the jury would have bought that, and I don't think there's a good argument for that. If there are no further questions, Your Honor, I think I just wanted to mention one thing that came up, Judge Ripple, your question to opposing counsel about whether trial counsel, Attorney Frost, what she talked to Mr. Gonzalez about on cross-examination. She got him to admit that he lied to the police the next day, admitting that he hadn't been at the bar. She got him to admit that he turned over a gun to the police that he wasn't legally allowed to have. She impeached him with his prior statement that two days later he told a detective that he wished he was the one who pulled the trigger. Who was the one? Gonzalez. Trial counsel got Gonzalez to admit that he didn't like Montour because he had, quote, caused some shit for her. Pedro Gonzalez, she means. Yes, yes, Pedro Gonzalez, of course. She got him to admit that he deleted and erased texts between him and Montour from the night of the incident before the police could see them. He admitted that he and Adrian Valadez, that the victim and Adrian Valadez had beat him up pretty bad with a gun during a 2012 home invasion. And she got him to admit in front of the jury, of course, that he had immunity for testifying against Montour. So in summary, she got him to admit that he had a motive to shoot BK and to blame Montour for it and that he was protected from prosecution from the incident himself for testifying against Montour. So trial counsel did heavily impeach Pedro Gonzalez  and also there was another. She got Adrian Gonzalez to admit that he saw that Pedro, that he told the police that Pedro Gonzalez was a passenger in the car, not driving. So that gives him also the opportunity to shoot the gun instead of Montour. So she did cross-examine based on her acquittal theory pretty effectively. And if there are no further questions, I see my time is up. Thank you. Thank you, Your Honor. Ms. Edinger, anything further? Yes, Your Honor. I can very quickly clean up the concern about the caption. Tyler Montour did legally change his name to Tyler Gonzalez because one of the witnesses in the case is Pedro Gonzalez. We've continued to refer to him as Tyler Montour for this litigation, and the caption should say that he is now known as Tyler Gonzalez. But we just wanted to avoid the confusion. Ms. Epplett is now the current. Not simply that he's known as Tyler Gonzalez. I understand that the state court entered an amended judgment. That is correct. Naming the person in prison as Tyler Gonzalez. That is correct, Your Honor. That is correct. Ms. Epplett is now the warden of Oshkosh. Indeed. If I may, thank you. So Epplett is the correct warden, not Jess? Correct. Okay. Correct. We've talked a lot about prejudice this morning, and so I just want to emphasize. I really think since we have this apparent disagreement, the state and the defendant don't know who the warden of the prison is, I would like you to put your heads together and file a document telling us where Mr. Gonzalez is now in prison and who the warden of that place is. That would be helpful for us. Of course, Your Honor. All right. We'll reset you to 30 seconds, counsel. Thank you. Thank you, Your Honor. I'd like to emphasize, because we have talked a lot about prejudice this morning, that the state is the one who requested the lesser-included instruction. It's not something we've talked about so far, but when the state has requested the instruction, it's because they think there's some evidence to support it. There's a concern that this isn't a solid case of attempted first-degree homicide, and that is absolutely correct. There is – did you have a question? Don't be distracted by the clock. Thank you. My colleague had mentioned about procedural default. I'm happy to answer any questions that the court has about that, but the issue is limited to fair presentment, and fair presentment is not at issue in this case because it was a very fulsome partial petition, and it's a very pragmatic review of whether the Wisconsin Supreme Court had an opportunity to rule on the merits. It absolutely did and used a denied word. So we're here correctly. Okay. Thank you, Ms. Ettinger. Thank you. The case was taken under advisement.